# UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF OHIO

In Re:

Cindy Sue Pinckley Wolph

    Debtor(s)

Cindy Sue Pinckley Wolph

    Plaintiff(s)

v.

U.S. Department of Education, et al.

    Defendant(s)

**JUDGE RICHARD L. SPEER**

Case No. 11-3145

(Related Case: 11-32939)

## DECISION AND ORDER

This cause comes before the Court after a Trial on the Plaintiff/Debtor's Complaint to Determine Dischargeability. At issue at the Trial was whether the Plaintiff, Cindy Sue Pinckley Wolph, was entitled to receive a discharge of a number of educational debts pursuant to the "undue hardship" standard as set forth in 11 U.S.C. § 523(a)(8). At the conclusion of the Trial, the Court deferred ruling on the matter so as to afford the opportunity to fully consider the evidence and the arguments raised by the Parties. The Court has now had this opportunity and, for the reasons set forth herein, declines to enter a finding of "undue hardship."

## BACKGROUND

The Plaintiff, Cindy Sue Pinckley Wolph (hereinafter referred to as the "Plaintiff"), is a divorced woman, 48 years of age. The Plaintiff has two sons, ages 19 and 16. The younger son presently resides in the Plaintiff's household, while the Plaintiff's eldest son attends college and lives away from home during the school year.

At the present, the Plaintiff has certain medical issues which require her to take medication. The Plaintiff's medical issues, however, do not render the Plaintiff disabled or otherwise prevent the Plaintiff from working. In fact, the Plaintiff just recently obtained full-time employment in the field of social work. With her new employer, the Plaintiff earns approximately $35,000.00 per year, but receives no medical benefits. The Plaintiff's new employer is located approximately an hour's drive from the Plaintiff's home. With her new employer, the Plaintiff receives, after mandatory deductions, $2,146.00 in monthly income. (Doc. No. 84, Ex. 11).

The Plaintiff is a very well educated woman. In 1987, the Plaintiff obtained a bachelor's degree in psychology. Following this, the Plaintiff attended graduate school, studying "popular culture." During this time, the Plaintiff also obtained a license in social work, thereafter obtaining full-time employment in this field. The Plaintiff financed these educational pursuits by obtaining student loans.

In 2002, the Plaintiff quit her employment to attend law school as full-time student. In 2005, the Plaintiff obtained her law degree, subsequently passing the bar examination and becoming a licensed attorney in the state of Ohio. After graduating from law school, the Plaintiff continued to pursue her legal education, attending classes to obtain an LLM in taxation. For financial reasons, however, the Plaintiff never obtained an LLM degree. Again, the Plaintiff financed these educational pursuits through the use of student loans. In terms of the amount of outstanding educational debts now owed by the Plaintiff, most is attributable to her legal education.

After completing law school, the Plaintiff, although making a concerted effort, was unsuccessful in obtaining full-time legal work within a reasonable geographic proximity to her home. Instead, until obtaining her present position, the Plaintiff worked part time, doing intermittent legal work and, when possible, offering her services as a tax preparer. Working on only a part-time basis, the Plaintiff has been unable to earn an appreciable level of income since graduating from law school.

For the past six years, the Plaintiff's earned income has varied between the range of $7,281.00 to $15,566.00. On this earned income, the Plaintiff has received significant tax refunds, typically ranging between $4,000.00 and $5,000.00, although in the 2011 tax year, the Debtor's tax refund fell below $3,000.00. The Plaintiff's income has also been supplemented through other sources.

First, the Plaintiff received child-support payments for her children. At the present, these payments total $278.00 per month. In the past, and until recently, the Plaintiff also received various forms of public assistance to supplement her income.

On May 24, 2011, the Plaintiff filed a petition in this Court for relief under Chapter 7 of the United States Bankruptcy Code. This was the second bankruptcy case filed by the Plaintiff, with the Plaintiff having previously sought bankruptcy relief in the year 2000 when she was going through a divorce. On July 25, 2011, the Plaintiff commenced this adversary proceeding, seeking a determination that those obligations she incurred to finance her educational pursuits should be determined to be dischargeable debts pursuant to the "undue hardship" standard set forth in 11 U.S.C. § 523(a)(8).

Named as Defendants in the Plaintiff's adversary complaint are these Parties: (1) ECMC (Educational Credit Management Corporation); (2) Access Group;[1] and (3) the United States Department of Education. At the time of the Trial held in this matter, the Plaintiff owed to these entities the following sums on her student-loan obligations:

| | |
|---|---|
| $213,248.44 | ECMC |
| $28,900.00 | Access Group |
| $14,925.52 | United States Department of Education |

---

[1] Collectively, this Defendant is comprised of these entities: Conduit Deutsche ELT Access Group, Deutsche Bank ELT Access Group, and Access Group, Inc.

Cindy Sue Pinckley Wolph v. U.S. Department of Education, et al.
Case No. 11-3145

        Total:        $257,073.96

Also named as a Defendant in this action was Sallie Mae, Inc. to whom the Plaintiff owned approximately $36,000.00. On this obligation, the Plaintiff's parents were co-signatories. Prior to the time of the Trial held in this matter, the Plaintiff and Sallie Mae came to an accommodation on this obligation whereby the Plaintiff agreed to repay Sallie Mae, as a nondischargeable debt, the sum of $18,000.00. (Doc. No. 63).

Additionally, the Plaintiff is obligated to the United States Department of Education in an amount just over $10,000.00 for an educational loan she incurred for the benefit of her son. The issue as to the dischargeability of this loan, however, was not before the Court at the Trial held on the Plaintiff's Complaint to Determine Dischargeability, with the Plaintiff having incurred this obligation on a postpetition basis.

Since incurring her student-loan obligations, the Plaintiff has entered into a number of temporary deferment/forbearance agreements with the Defendants. In addition, before attending law school, the Plaintiff made some periodic payments toward her student-loan obligations. Since graduating from law school, however, payments toward her educational obligations have ceased.

The Plaintiff represented that, at the time of the Trial held in this matter, she had necessary, monthly expenses of $2,223.00, leaving a shortfall in her budget of $77.00 per month. The expenses listed by the Plaintiff included an expenditure of $500.00 per month for housing. For this expense, the Plaintiff explained that her parents had assumed legal responsibility for the mortgage held against her property, but that she still pays for all the costs associated with the residence, such as the mortgage and utilities. For her budgeted expenses, the Plaintiff testified that she has assumed the responsibility to pay for some expenses incurred by her sons. In particular, the Plaintiff pays for two smart phones, one for each son; as well, the Plaintiff pays the insurance for a vehicle operated by one of her sons.

Page 4

Cindy Sue Pinckley Wolph v. U.S. Department of Education, et al.
Case No. 11-3145

## DISCUSSION

Before this Court is the Plaintiff's Complaint to Determine Dischargeability. A proceeding, such as this, brought to determine the dischargeability of particular debts is deemed to be a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). Accordingly, as a core proceeding, this Court has the jurisdictional authority to enter final orders and judgments in this matter. 28 U.S.C. § 157(b)(1).

In a bankruptcy case, debts incurred by a debtor to finance a higher education are generally excepted from discharge. 11 U.S.C. § 523(a)(8). This type of exception to dischargeability, first enacted by Congress in 1976, is predicated upon certain public policy concerns such as perceived abuses, whereby students use the bankruptcy process to escape obligations they could otherwise pay, and concerns for the insolvency of the student-loan program. *Grine v. Texas Guaranteed Student Loan Corp. (In re Grine)*, 254 B.R. 191, 196 (Bankr. N.D.Ohio 2000). In determining that student loans should be excepted from discharge, however, Congress recognized that some student-loan debtors were still deserving of the fresh-start policy provided for by the Bankruptcy Code.

To this end, Congress provided that a debtor could still be discharged from an educational debt if it were established that excepting the obligations from discharge would impose an "undue hardship" upon the debtor and the debtor's dependents. As set forth in 11 U.S.C. § 523(a)(8):

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–
>
>> (8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for–
>>
>>> (A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or

Page 5

>>(ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or

>>(B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual[.]

For purposes of this provision, it is the debtor's burden to show the existence of "undue hardship" by at least a preponderance of the evidence. *Malone v. Higher Educ. Student Asst. (In re Malone)*, 469 B.R. 768, 773 (Bankr. N.D.Ohio 2012).

As used in § 523(a)(8), the term "undue hardship" is not defined. At a minimum, however, it is established that "undue hardship" denotes a heightened standard, requiring a showing beyond the garden-variety financial hardship experienced by most debtors who seek bankruptcy relief. *In re Frushour*, 433 F.3d 393, 400 (4th Cir.2005). For the heightened standard of "undue hardship," the Sixth Circuit Court of Appeals held, in the case of *Oyler v. Educational Management Credit Corp. (In re Oyler)*, 397 F.3d 382 (6th Cir.2005), that a court should apply what is known as the Brunner test, named after the case of *Brunner v. New York State Higher Educ. Serv. Corp.*, 831 F.2d 395 (2nd Cir.1987).

Under the Brunner test, a debtor must show the existence of each of the following three elements to have a student loan discharged on the basis of "undue hardship":

>(1) That the debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans;

>(2) The additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans;

>(3) That the debtor has made good faith efforts to repay the loans.

*Id.* at 399–400. At the Trial held in this matter, the Defendants concentrated their efforts on the third element of this test, taking the position that the Plaintiff has not made a "good faith effort" to repay

Page 6

her student-loan debt. This approach, of focusing on the third element of the Brunner test, cannot be criticized.

The first two elements of the Brunner test concern a debtor's ability to repay their student loans, both in the present and in the future. In this case, however, any ability on the part of the Plaintiff to fully repay her student-loan obligations seems remote. The Plaintiff's aggregate outstanding student-loan obligation is $257,073.96, a staggering sum. What is more, the magnitude of this debt becomes particularly compelling when compared to the Plaintiff's income.

From her newly found employment, the Plaintiff presently nets $2,223.00 per month, amounting to $26,676 per year. Thus, even if the Plaintiff's were able to devote a third of this income toward the repayment of her student loans, an amount just under $9,000.00, it would take the Plaintiff almost 30 years to repay her student-loan obligation. This scenario, of course, assumes that the Plaintiff's student-loan obligations will not accrue interest, and that the Plaintiff's budget could handle such a large expense, both unlikely assumptions. In this regard, it is observed that the Plaintiff's household budget is, for the most part, frugal. For example, the Plaintiff's rent/mortgage is only $500.00 per month.

There is also no indication that the Plaintiff's financial situation will improve in a significant way. One of the best indicators, when attempting to predict a debtor's future financial situation, comes from events that have occurred in the past. *Berry v. Educ. Credit Mgmt. Corp. (In re Berry)*, 266 B.R. 359, 365–66 (Bankr.N.D.Ohio 2000). For this purpose, the Plaintiff, since receiving her undergraduate degree, has never earned an appreciable level of income.

In fact, in the more recent past, the Plaintiff's income has been particularly low, requiring her to seek out public assistance. Moreover, this situation still persists, notwithstanding the Plaintiff's efforts to improve her situation, with the evidence in this case showing that, since graduating from law school, the Plaintiff has made a concerted, but unsuccessful effort to find more remunerative

Page 7

Cindy Sue Pinckley Wolph v. U.S. Department of Education, et al.
Case No. 11-3145

employment in the legal field. As a result, the Plaintiff recently accepted an offer of employment in the field of social work, a field of employment normally less remunerative than the legal profession.

Consistent, therefore, with the position of the Defendants, the salient question in this case is whether, under the third prong of the Brunner test, the Plaintiff made a good faith effort to repay her student loans. This requirement serves the goal of helping to ensure that a debtor acts responsibly toward their student-loan creditor given that educational loans are, in most cases, extended without regards to a debtor's creditworthiness, with the expectation that the debtor will use their education to obtain remunerative employment so as to be able to repay the debt. *Stupka v. Great Lakes Educ. (In re Stupka)*, 302 B.R. 236, 243 (Bankr. N.D.Ohio 2003).

In assessing the third prong of the Brunner test, the question that naturally comes to the forefront is the degree to which a debtor actually makes payments toward their student-loan obligation. As this Court previously explained: "Based on its focus on a debtor's efforts at repayment, inherent in any good-faith analysis under the third prong of the Brunner test is whether and the extent to which the debtor actually made any voluntary payments on the obligation." *Campton v. U.S. Dep't of Educ. (In re Campton)*, 405 B.R. 887, 893 (Bankr. N.D.Ohio 2009). In the same breath, however, this Court has observed that "'good faith' is an amorphous concept, and therefore is largely dependent upon the differing circumstances of each case. As such, whether a debtor has made payments on a student-loan obligation will not always be dispositive." *Grant v. United States Dept. of Ed. (In re Grant)*, 398 B.R. 205, 212 (Bankr. N.D.Ohio 2008).

When looking at just the issue of the Plaintiff's payment history on her student-loan obligations, the matter of good faith remains for the Court indeterminate. On the one side, the evidence shows that, insofar as it concerns those obligations incurred to finance her undergraduate degree, the Plaintiff did make significant headway in repaying the debts. At the same time, most of the educational debts now outstanding are those incurred by the Plaintiff to finance her legal education. And for these obligations, the Plaintiff has not made any payments.

Page 8

The Plaintiff justifies this lack of payment on her low level of income since graduating from law school. However, such an explanation, while viable to a certain extent, cannot fully stand in this case. Since leaving law school, the Plaintiff has received significant annual tax refunds. On receipt of a large tax refund, however, the Plaintiff did not utilize any of the funds toward the repayment of her student-loan obligations. Such an nonchalant approach toward her student loans cannot be equated with good faith.

When this issue was raised, the Plaintiff explained that she used the funds received from her tax refunds to pay necessary bills. However, this response only begs the question: Do not the creditors who hold claims for financing the Plaintiff's legal education also constitute obligations warranting repayment? Along this same line, it did not go unnoticed to the Court that the Plaintiff pays for the costs associated with two 'smart phones' used by her sons. While the Court understands the Plaintiff's desire to help her sons, it is also true that expenditures on items such as 'smart phones' are a luxury, and thus should not be undertaken at the expense of one's educational obligations.

Still, looking beyond the lack of actual payments made by the Plaintiff, there do exist certain indicia of good faith on the part of the Plaintiff. To begin with, the Plaintiff actively sought out and entered into various deferments/forbearance agreements for her student-loan obligations. For the Court, this fact exhibits a responsible approach to one's student loan obligations, and thus may be an indicator of good faith. *See Sandra Cekic–Torres v. Access Group, Inc. (In re: Cekic –Torres)*, 431 B.R. 785, 795 (Bankr. N.D.Ohio 2010).

This Court has also recognized that good faith can be exhibited when a debtor makes a concerted effort to improve their financial situation, but is unable to do so because of events beyond their control. *Grant v. United States Dept. of Educ. (In re Grant)*, 398 B.R. 205, 214 (Bankr. N.D.Ohio 2008). Consistent with this consideration, this Court recognizes that, after graduating from law school, the Plaintiff engaged in a systematic effort to find suitable employment but, for reasons largely beyond her control, such efforts were not successful. In sum, while all the steps undertaken

Cindy Sue Pinckley Wolph v. U.S. Department of Education, et al.
Case No. 11-3145

by the Plaintiff do not need to be mentioned herein, it suffices to say that the Plaintiff has devoted many hours of her time in a good faith effort to improve her financial situation.

The efforts the Plaintiff made to improve her financial situation also leads to another favorable good faith consideration. Specifically, the Plaintiff, after graduating from law school, did not seek to immediately discharge her student loans. *See Wilcox v. Educ. Credit Management (In re Wilcox)*, 265 B.R. 864, 870 (Bankr. N.D.Ohio 2001) (in determining good faith for the discharge of a student loan debt, court may consider the length of time after student loan first becomes due with that of when the debtor seeks to discharge the debt). Instead, a period of approximately six years lapsed before the Plaintiff came to this Court, seeking to discharge her student-loan indebtedness.

These considerations, however, are more than tempered by what the Court finds to be some troubling aspects concerning the circumstances surrounding the Plaintiff's student-loan obligations. As mentioned earlier, the amount of the Plaintiff's student-loan obligations is staggering, exceeding more than a quarter of a million dollars. Although some portion of this debt is undoubtably comprised of accrued interest, as well as nonpayment penalties, the sheer scope of the debt does raise serious questions regarding whether the Plaintiff, despite her statements to the contrary, ever really expected that she would be able to repay her student-loan debt. A couple of matters brought to the Court's attention bring this supposition into focus.

First, given her family ties to the area, the Plaintiff testified that, although she diligently sought to obtain legal work, she was not willing to seek such employment in a large metropolitan area where, presumably, the prospects for obtaining higher paying legal jobs would be greater. Second, even after running up student-loan obligations of around a quarter of a million dollars, the Plaintiff still thought it prudent to incur further student-loan debt, having borrowed $10,000.00 to help finance her son's education. Again, while the Court appreciates the Plaintiff's desire to help her children, the Plaintiff took this loan at a time when she was unable to service her own loan obligations. As such, this act shows a course of conduct on the part of the Plaintiff whereby she does

Page 10

not consider the financial consequences of her actions. In this regard, the Court will not countenance the use of the student-loan program as an endless trough from which one may take a drink.

The Court also finds troubling the disparate treatment the Plaintiff afforded to her student-loan creditors. In this adversary proceeding, the Plaintiff came to an accommodation with one of her creditors, Sallie Mae, whereby the Plaintiff agreed to partially repay the obligation. The Plaintiff explained that she was motivated to make such an accommodation for one reason: her parents were jointly liable on the obligation. For the Court, however, such a personal motive to pay one of her educational debts, while seeking to discharge all of her remaining educational obligations, does not square with the good faith prong of the Brunner test. To the contrary, the fact that the Plaintiff is willing to make an effort to repay some portion of her student-loan debt, while also finding it expedient to seek a discharge of the remaining educational debt, particularly resonates with the Court as a negative aspect given that repayment programs, outside of bankruptcy, are available to student-loan debtors.

Debtors in the Plaintiffs' position, whose student loans are made or guaranteed by the government, are generally able to participate in repayment programs outside of the bankruptcy context such the Income Contingent Repayment Program (ICRP) and the Income Based Repayment Program (IBRP or IBR). Under these programs, a person meeting certain requirements is able to have the amount of future payments due on their student loans calculated according to their income, as opposed to their payment being amortized based upon the outstanding balance of the loan.

However, despite the advantages such programs could afford to a person, such as the Plaintiff, the Plaintiff, even after she was presented with the opportunity, did not seek to take advantage of such programs. The Plaintiff, instead, thought it expedient to first take her chances in this Court as the following comments made by the Plaintiff during a deposition show:

> Question: And she explained to you that you would need to reapply for IBR

> Answer: Yes.
>
> Question: Are you planning on doing that, Ms. Wolph?
>
> Answer: Well, actually, you know, given the numbers, I'm certain that at least at the present time, you know, I would qualify for it, and if I do get a job where I make some more money then I would have no problem paying my student loans. But I am not willing to dismiss the bankruptcy or the adversary proceeding at this time because the worst-case scenario is the judge rules against me and I have to pay, and then when I have to pay I will consolidate and apply for IBR and, you know, if my income is low, you know, I'll – I'll have the same result. But I have to – I still have that hanging over me, though.

(Def. Ex. L., at pg. 135).

Subsequently, in her deposition, the Plaintiff provided this testimony:

> Question: Well, you can pay them through the IBR program.
>
> Answer: And if my adversarial proceeding results against me then I definitely will. I mean, I how I – you know, I know objectively I qualify so since I've come this far and stressed myself out so bad and cost myself money, now I'm missing work since I'm working, and gas money and things like that, I just have to proceed forward, and If I'm ruled against, then, I mean, my numbers aren't going to change.

*Id.* at pg. 148.

Particularly in light of those other considerations already discussed, this approach of the Plaintiff, of first seeking to roll the dice in this Court, by not first attempting to participate in a nonbankruptcy repayment program, is not consistent with the idea that bankruptcy should be used only as a last resort. *See Schultz v. United States*, 529 F.3d 343, 347 (6th Cir. 2008). In this regard, the Sixth Circuit has recognized that, while not a "per se" indication of a lack of good faith, a debtor's decision not take advantage of one of these programs is probative on the issue of a debtor's

Page 12

intent to repay the student loan obligation. *Tirch v. Pennsylvania Higher Educ. Assis. Agency (In re Tirch)*, 409 F.3d 677, 682 (6th Cir. 2005) (specifically addressing the ICRP).

In the final analysis, those considerations showing on the part of the Plaintiff a lack of good faith in repaying her student-loan debt, as discussed herein, simply outweigh those indicia of good faith which operate in the Plaintiff's favor. The Plaintiff has, thus, failed to sustain her burden under the third prong of the Brunner test. Consequently, as it is the Plaintiff's burden to establish each and every element of the Brunner test, the Court cannot find that the "undue hardship" standard for discharging student loans under § 523(a)(8) exists in this particular case.

In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Decision.

Accordingly, it is

**ORDERED** that this adversary proceeding, be, and is hereby, DISMISSED.

Dated: September 27, 2012

_/s/ Richard L. Speer_
Richard L. Speer
United States
Bankruptcy Judge

# CERTIFICATE OF SERVICE

Copies were mailed this 27th day of September, 2012 to:

Cindy Sue Pinckley Wolph
308 Independence Ave.
Fostoria, OH 44830

Access Group, Inc.
5500 Brandywine Pkwy.
Wilmington, DE 19803

Conduit Deutsche ELT Access Group
60 Wall St.
MS NY C 60 2606
New York, NY 10005

Deutsche Bank ELT Access Group
60 Wall St.
New York, NY 10005

Tami Hart Kirby
One South Main St, #1600
Dayton, Oh 45402

Bony Mellon Elt Slm Trusts
11600 Sallie Mae Dr.
Deb Southerland Reston, VA 20193

Department of Education/FedLoan Svc
PO Box 69184
Harrisburg, PA 17106-9184

Xpress Loan Servicing
1500 West Third St.
Suite 125
Cleveland, OH 44113

Paula A. Hall
401 S. Old Woodward Ave, #400
Birmingham, MI 48009

Daniel N Sharkey
401 South Old Woodward Ave, #400
Birmingham, MI 48009

Matthew C. Dawson
401 S. Old Woodward, #400
Birmingham, MI 48009

Sallie Mae, Inc.
c/o Becket & Lee, LLP
16 General Warren Boulevard
Malvern, PA 19355

Phyllis A Ulrich
24755 Chagrin Blvd, #200
Cleveland, OH 44122

US Department of Education
09 10 LPCP
830 First St. N.E.
Washington, DC 20202

Steven M. Dettelbach eswee06
United States Attorney
Four Seagate, Suite 308
Toledo, OH 43604

/s/Diana Hernandez
Clerk, US Bankruptcy Court